Filed 11/18/21 In re N.W. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re N.W. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D079086 |
| Plaintiff and Respondent, | (Super. Ct. Nos. J520236A-B) |
| v. | |
| N.S., | |
| Defendant and Appellant; | |
| G.W., | |
| Defendant and Respondent. | |

APPEAL from orders of the Superior Court of San Diego County, Browder A. Willis III, Judge. Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Edridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel and Emily Harlan, CWLS, Deputy County Counsel for Plaintiff and Respondent.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Respondent.

## INTRODUCTION

N.S. (Mother) appeals from juvenile court orders that terminated dependency jurisdiction over her two young children, N.W. and H.W., and awarded joint legal custody to Mother and G.W. (Father) and primary physical custody to Father. She does not challenge the termination of dependency jurisdiction. Her sole contention on appeal is that the juvenile court abused its discretion by awarding Father with primary physical custody rather than equal physical custody of the children to both parents, as she had requested. Finding no abuse, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

*Initiation of Dependency Proceedings Through Post-Disposition Review Orders*

Mother and Father, who are not married, lived with each other from approximately December 2014 to December 2019. They have two children, N.W. (age 6) and H.W. (age 3). The parents' relationship involved a significant history of domestic violence. As Mother acknowledged in her opening brief on appeal, "Father and Mother were physically violent with each other, and the children saw some of the violence." Mother also suffered from mental health illness, and was psychiatrically hospitalized twice in August 2019 as a result of overdosing on prescription medication and expressing suicidal ideations. From 2017 to 2019, leading up to this

2

dependency case, the San Diego County Health and Human Services Agency (Agency) had attempted to intervene on behalf of the children, but the parents "evad[ed] the Agency," "minimized or denied their history of domestic violence," and declined services, including for domestic violence.

On December 20, 2019, the Agency filed dependency petitions on behalf of N.W. and H.W. pursuant to Welfare and Institutions Code[1] section 300, subdivision (b)(1). The petitions alleged the children had been exposed to a domestic violence incident on December 10, during which Father hit Mother and strangled her until she lost consciousness. As a result, the Agency alleged the children suffered, or there was a substantial risk that they would suffer, serious physical harm or illness as a result of their parents' failure or inability to supervise or protect them adequately.

From December 9 to December 15, 2019, Mother reported to law enforcement "a series of domestic violence incidents" that occurred in the home with the children present. In the last reported incident of December 10, Mother stated Father strangled her until she lost consciousness. On December 15, officers arrested Father for violation of a restraining order.[2] They observed bruising around Mother's neck, right leg, and left arm. Father denied strangling or hitting Mother, and reported that Mother had, in the past, threatened him with a knife, including while he was holding H.W.

---

[1]    All statutory references are to the Welfare and Institutions Code unless indicated otherwise.

[2]    In March 2019, a criminal protective order was issued against Father, prohibiting him from having contact with Mother, except for peaceful exchanges of their children. Mother and Father continued to live together in violation of the protective order. Mother told the Agency she did not want a restraining order or "any type of court order."

Father told the Agency that he had told Mother, " '[w]e need to stop this, we are going to kill each other.' "

At the detention hearing on December 23, 2019, the juvenile court found the Agency had made prima facie showings in support of its petitions and detained the children in a foster care home or with a relative or non-relative extended family member. At the contested jurisdiction and disposition hearing in February 2020, the court found true the petitions' allegations, declared the children dependents of the court, placed them in a confidential licensed foster home, and ordered reunification services for both parents. It also ordered supervised visits with the children for Father and unsupervised visits for Mother.

At the six-month review hearing in August 2020, the Agency reported that both parents had made "great progress" regarding their insight into the protective issues and both had fully engaged in services. The parents had obtained separate residences, the children had been placed in Mother's care for a 60-day trial visit in late June 2020, and Father had progressed from supervised to unsupervised visits. At the Agency's recommendation, the juvenile court placed the children with Mother, ordered family maintenance services, and granted the Agency discretion to allow Father to have overnight visits or a 60-day trial visit with the children. The court set an interim review hearing for November 2020 with the possibility of closing the case before the regularly scheduled 12-month review hearing.

In its report for the November 2020 hearing, the Agency recommended the court terminate jurisdiction "as [the case] no longer appear[ed] to be a Child Welfare issue but a Family Court and custody issue." Both parents had "shown behavior changes consistent with mitigating the dangers and safety issues" to the children and the Agency believed they could coparent safely

4

using email communication and third-party custody exchanges. The Agency recommended the court award joint legal custody with physical custody to Mother and unsupervised overnight visits to Father. It also requested that the court refer the parents to "Family Court Mediation" for custody issues upon Father's return from deployment in May 2021. Father was an active service member of the United States Navy.

However, at the November 2020 hearing, the children's counsel requested a 30-day continuance to investigate "privileged information" she had recently received. On December 15, the Agency informed the court that it was investigating a new referral for allegations of excessive discipline of N.W. by Mother. The court again continued the review hearing to allow the Agency to complete its investigation and granted the Agency discretion to detain the children with Father if he were able to return from his deployment on an emergency basis. In the meantime, with Mother's agreement, the children were being cared for by their daycare provider, Ms. G., pursuant to a safety plan.

On December 14, 2020, during an unannounced visit with Ms. G., a social worker observed N.W. had three teeth missing, her two front teeth and one on the bottom right. Ms. G. showed the social worker a cell phone video she had taken of N.W. on December 9. In the video, N.W., who was excessively drooling, told Ms. G. that " 'my mom popped me on the mouth' " that morning. N.W. did not appear upset or scared and stated four of her teeth had been loose, pointing to two top and two bottom teeth. N.W. stated that she did not know why Mother had smacked her, but it hurt her feelings. Her mouth began bleeding and Mother put napkins in her mouth to stop the bleeding. They looked around in the dark and found her teeth on the ground.

Ms. G. told the social worker that N.W. would not talk or eat on December 9, 2020. Ms. G. texted Mother that morning inquiring about N.W.'s missing teeth and Mother texted back, " 'Oh you just saw that?' " with three laughing emojis. Mother explained to Ms. G. that she had " 'popped [N.W.] in the mouth' " that morning because N.W. was being loud. Mother stated that N.W.'s teeth were already loose and fell out. Ms. G. told the social worker she knew before the incident that N.W.'s top left tooth and bottom tooth were loose, but not the front right tooth.

When Mother arrived later on December 14, 2020 to pick up N.W., the social worker met Mother at her car and explained what N.W. had disclosed regarding Mother smacking her and her teeth falling out. Mother stated that N.W. could tell elaborate stories and explained that at 5:00 a.m. that morning, N.W. was screaming and yelling in front of their apartment complex as they were leaving. Mother stated she " 'popped' " N.W. on the mouth " 'very lightly,' " demonstrating it by placing her hand over her own mouth, and that N.W. put her hands up in the air and must have bitten down. Mother stated that N.W.'s teeth " 'were hanging on by a thread.' " When the social worker explained to Mother about the need for the Agency to conduct an investigation and the need for a safety plan for the children, at least until a medical exam had been completed, Mother became very agitated and directed profanities at the social worker. Mother then drove away without the children.

During a subsequent phone interview with another social worker, Mother provided a different account of the incident. She explained that she was merely trying to "lightly put her hand in front of [N.W.'s] mouth" to quiet her when N.W. became defensive and put up her hands. N.W. then "slipped" and " 'fell into' " another parked vehicle "on her 'shoulder' area." Mother was

6

not sure whether the child had also hit her head on the vehicle, but she denied causing N.W.'s teeth to fall out. Mother claimed she " 'didn't even touch her.' " According to Mother, N.W.'s teeth had been loose and bleeding the days before the incident. She believed the incident " 'wasn't that big of a deal' " and that she and N.W. talked and laughed about it afterward. On another occasion, Mother told the social worker N.W. acted like her Father and was a liar.

In N.W.'s forensic interview on December 16, 2020, N.W. denied that anyone had done " 'any hurting' " of her. When asked about her missing teeth, N.W. said " 'they fell out' " when Mother " 'smacked me.' " She said her mouth was bleeding and "it felt 'weird.' " She did not know why Mother smacked her and denied that anyone had fallen during the incident. When asked how she felt when Mother smacked her, N.W. stated she felt " 'sad.' " When asked whether she felt safe with Mother, N.W. replied, " 'no.' " When asked whether she felt safe with Father, N.W. replied, " 'no.' " When asked to explain her answers, N.W. stated: " 'Because I said no.' "

During N.W.'s medical examination one week after the incident, the physician did not find any evidence of traumatic injury and concluded the exam was " 'indeterminate' " regarding physical abuse. Without knowing the prior condition of N.W.'s teeth, the physician was unable to determine how much force would have been necessary or used to knock out the child's teeth.

The Agency closed its investigation as "[i]nconclusive" as to whether Mother had committed physical abuse of N.W. Nevertheless, the Agency reported that it remained "extremely concerned" for the children in Mother's care. It found that Mother had provided different scenarios for the incident and had failed to take responsibility. Instead, Mother placed blame on N.W. and accused the child of being a liar, which the Agency stated "can be very

detrimental to the mental health of her children." The Agency also noted that Mother's service providers had implemented a safety plan for her own mental health. Finally, the Agency reported "no concerns for the children's safety or care" since they were placed in Father's care. Father had returned from his ship to San Diego a few days after the incident and began caring for the children, while Mother had supervised visitation with the children.

At the January 25, 2021 family maintenance review hearing, the Agency recommended the juvenile court terminate jurisdiction and issue custody orders, this time, for joint legal custody with physical custody to Father and supervised visitation for Mother. The Agency had also filed section 388 petitions requesting the court change its prior placement orders from placement with Mother to placement with Father. Mother requested a contested hearing on the section 388 petitions and a "contested exit order trial." At the request of the Agency and the children's counsel, the court issued an interim order detaining the children with Father and granted Mother supervised visitation pending trial.

At the combined hearing on March 18, 2021, the Agency withdrew the section 388 petitions. It recommended the court terminate its jurisdiction and issue custody orders. However, it recommended joint legal and joint physical custody of the children to both parents. The Agency reported that Mother had shown she could safely parent the children in her care, but it still had concerns regarding Mother's "impulsive reactions." The children appeared to be doing very well with Father, who had "shown his ability to step up as a full time parent for the children in addition to providing a safe home for the children." The Agency believed "each parent ha[d] the tools" to safely co-parent with their existing network. However, the children's

8

attorney requested a continuance to conduct a further in-person interview with N.W. before the court terminated jurisdiction and issued custody orders.

Accordingly, the juvenile court continued the family maintenance review hearing to April 28, 2021, to allow time for the parents to participate in Family Court Services (FCS) mediation, and maintained its prior order that the children remain in Father's care pending the hearing. The court noted that what was left was "the issue of exit orders and who is going to assume primary residence," and FCS mediation will allow the court to "get a baseline on how the [parents] feel about sharing custody, what type of visitation can be worked out, what can be worked out if [Father] gets deployed." Mother's counsel submitted on the continuance and the order for the parents to attend FCS mediation.

On April 28, 2021, Mother requested another referral for FCS mediation and a continuance of the review hearing because Father failed to appear at the first scheduled FCS mediation. Mother's counsel argued FCS mediation would provide "important information that will be *necessary* to craft the exit orders for th[e] case." (Italics added.) At the continued hearing on May 27, Mother requested another continuance to allow the parties to review the FCS mediation report, which they had only received that morning. The court granted the continuance to June 14, and indicated its tentative ruling was to adopt FCS's recommendations for joint legal custody and joint physical custody, with Father providing the primary residence for the children.

## II.

*Termination of Dependency Jurisdiction and Exit Custody Orders*

On June 14, 2021, the court held the contested family maintenance review hearing. Unsatisfied with the FCS report, Mother requested another

continuance and that the juvenile court order FCS to "conduct another mediation with a different mediator." The court denied her request, finding the request for a second mediation to be inappropriate. The juvenile court judge stated that he has "read hundreds of these family mediation reports," understands "how the information is compiled and presented," and the "content of the report is fairly standard from [his] experience in family court." The judge further stated that, in addition to the FCS report, he was relying on "the case file, [his] personal notes" and his "background information on th[e] case" and was prepared to proceed with the parties' arguments to "either closing out th[e] case with custody orders or otherwise."

In the FCS report, the mediator summarized the joint mediation session she conducted with Mother and Father, in which both parents provided, among other information, a history of their relationship, including the past domestic violence, their current residence and work schedule, a history of their parenting plan with the children since the dependency proceedings began in December 2019, and each of their concerns regarding the children and co-parenting. The mediator also listened to each parent's proposed parenting schedule and their supporting reasons. She also reviewed portions of the family court files pertaining to matters of paternity, support, issuance of a domestic violence temporary restraining order, and custody; the CWS history of referrals; a criminal records check for both parents; and certain of the Agency's reports in the dependency proceedings, including the report on the Agency's investigation of Mother's excessive discipline of N.W. in December 2020. Although the children were too young to be interviewed, the mediator obtained information about them from the parents and collateral sources. The mediator noted that Mother did not know where N.W. attended school and had no knowledge of her academic progress.

10

In contrast, Father knew where N.W. was attending school and reported that she was performing well academically. Considering the totality of the information, the mediator recommended the parents share legal custody, Father provide the primary residence, Mother would parent the children on alternating weekends and every Wednesday overnights, and the parents would alternate the holidays.

Both Father and the children's counsel agreed the court should adopt the FCS mediator's recommendations as to custody and terminate jurisdiction. Mother agreed to termination of jurisdiction, but disagreed with the proposed custody orders. She requested that the parents be awarded joint physical custody with both parents equally providing the primary residence for the children. Mother's counsel asserted that Mother disagreed with Father's comments, set forth in the FCS report, that he has been cooperative and responsive to Mother's requests for information since the children were placed in his care in December 2020, and requested that Mother be allowed to address the court "specifically regarding her concerns and ongoing concerns that she has had regarding her inability to get information from the father and the difficulties that she has regarding her ability to work with the children's teachers."

The juvenile court denied Mother's request to be heard on those specific matters, stating that: "This is a court of limited jurisdiction to a certain extent. *It is limited to the best interest of the children.* And that issue, as all counsel have agreed, has been addressed fully through the life of the dependency case. And the issues that brought the family to the [c]ourt's attention, to the dependency court's attention, no longer exist, as far as the law is concerned, as far as the [c]ourt is concerned. [¶] The issues that remain fall squarely within the jurisdiction and the culture of family court.

11

So Mother's concerns about communication, or lack thereof, Mother's concerns about the specifics related to education, and/or her access on a daily basis or any other form of access, falls squarely within the jurisdiction and culture of family court and the nature of the co-parenting issues." (Italics added.)

The juvenile court found the conditions that justified the initial assumption of dependency jurisdiction no longer existed, those conditions were not likely to recur if supervision is withdrawn, and that placement with the parents would not be detrimental to the children. Accordingly, the court terminated dependency jurisdiction as to both children. The court issued exit orders awarding joint legal custody to the parents and physical custody to Mother and Father as set forth in the FCS report, including primary residence to Father.[3] Mother timely filed a notice of appeal, challenging only the court's custody orders.[4]

## DISCUSSION

Mother's sole contention on appeal is that the juvenile court abused its discretion by awarding Father with primary physical custody of the children, instead of equal physical custody to both parents. She contends family court mediation is an "[i]nadequate [b]asis" for determining the custodial terms of a juvenile court's exit order and the court erred when it "merely adopt[ed] the custodial recommendations of a family law mediator who operates primarily from the perspective of the family law court." Mother also argues substantial

---

[3]    The court adopted the custody orders prepared by Father on Form JV-200 and Form JV-205, which had attached the FCS mediator's proposed custody sharing plan.

[4]    Mother does not challenge the June 14, 2021 orders to the extent the juvenile court terminated its dependency jurisdiction over the children.

evidence does not support the court's implied finding that its custody orders are in the children's best interests. We reject Mother's claims.

I.

*No Error in the Juvenile Court's Use of FCS Mediation*

The record is clear: Mother not only failed to object to the juvenile court's use of FCS mediation to determine its exit orders, but she had also expressly invited the court to do so. Mother agreed to the court's order referring the parents to FCS mediation for the purpose of assisting the court in fashioning the custodial terms of its exit orders. When Father failed to appear for the first scheduled mediation, Mother requested the court continue the review hearing so that the parties could attend mediation. When she was unsatisfied with the FCS report and recommendations, Mother requested that the court order the parties to attend a second FCS mediation with a different mediator. Multiple continuances of the family maintenance review hearing were granted, at her request, specifically to allow the court to consider information from the FCS mediation. And, contrary to her argument on appeal that FCS mediation was an "[i]nadequate [b]asis," she argued below that it would provide "important information that will be *necessary* to craft the exit orders for th[e] case." (Italics added.)

Under these circumstances, we conclude Mother's claim regarding the juvenile court's use of FCS mediation is precluded by the doctrines of forfeiture and invited error. "[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. [Citation.] The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.] [¶] Dependency matters are not exempt from this rule." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. omitted; *In re Dakota H.* (2005) 132 Cal.App.4th 212, 222 ["Forfeiture . . . applies in juvenile dependency

13

litigation and is intended to prevent a party from standing by silently until the conclusion of the proceedings."].)  Moreover, "[u]nder the doctrine of invited error, when a party by its own conduct induces the commission of error, it may not claim on appeal that the judgment should be reversed because of that error." (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212.)

Even if Mother's claim was not precluded, we see no error in the juvenile court's use of FCS mediation in determining the custodial terms of its exit orders.  To be clear, it has been long recognized, as Mother notes, that family law statutes differ from juvenile dependency statutes and do not bind a juvenile court in making dependency determinations.  "Dependency proceedings in the juvenile court are special proceedings governed by their own rules and statutes.  [Citations.]  Unless otherwise specified, the requirements of the Civil Code [or Family Code] and the Code of Civil Procedure do not apply." (*In re Jennifer R.* (1993) 14 Cal.App.4th 704, 711 (*Jennifer R.*).)  In particular, "[a]lthough both the family court and the juvenile court focus on the best interests of the child[,] significant differences exist." (*Id.* at p. 712.)  The California Supreme Court has noted the differences between the family court and juvenile court, stating:

> "The two courts have separate purposes.  The family court is established to provide parents a forum in which to resolve, inter alia, private issues relating to the custody of and visitation with children.  In that setting, parents are presumed to be fit and capable of raising their children.  [Citation.]  The juvenile court, by contrast, provides the state a forum to 'restrict parental behavior regarding children, . . . and . . . to remove children from the custody of their parents or guardians.'  [Citation.] . . . The juvenile court has a special responsibility to the child as *parens patriae* and must look to the totality of a child's circumstances when making decisions regarding the child."

(*In re Chantal S.* (1996) 13 Cal.4th 196, 201 (*Chantal S.*).)

Notwithstanding "the difference in function between juvenile dependency and family law courts in the context of custody and visitation" (*In re John W.* (1996) 41 Cal.App.4th 961, 972 (*John W.*)), we find no merit in Mother's claim that it was error for the juvenile court to use FCS mediation to determine custody in an exit order.

First, mediation in juvenile dependency proceedings is favored by the Legislature. (§ 350, subd. (a)(2) ["Each juvenile court is encouraged to develop a dependency mediation program to provide a problem-solving forum for all interested persons to develop a plan in the best interests of the child, emphasizing family preservation and strengthening. The Legislature finds that mediation of these matters assists the court in resolving conflict, and helps the court to intervene in a constructive manner in those cases where court intervention is necessary."]; see also Cal. Rules of Court, rule 5.518 [standards of practice and administration for dependency mediation services].) Toward that objective, the San Diego County Superior Court adopted a local rule allowing the juvenile court to refer matters to mediation. (Super. Ct. San Diego County, Local Rules, rule 6.1.10 ["At the discretion of the [juvenile] court, a case may be referred to mediation."].) Many juvenile courts throughout California have adopted programs to refer parties to mediation, in which FCS mediators, who have expertise and training in family counseling and child custody matters, are routinely used. (See Edwards, *Moving Cases from Juvenile to Family Court: How Mediation Can Help* (2012) 16 U.C. Davis J. of Juv. L. & Policy 535, 547–549.)

Second, the record does not support Mother's contention that the juvenile court "merely adopt[ed]" or "arbitrarily adopted" the FCS mediator's recommendations and, by extension, improperly relied on family law rather than dependency law. Mother asserts the FCS mediator made her

15

recommendations "primarily from the perspective of the family law court." While it may be correct that family courts routinely employ FCS mediation for custody matters, we perceive nothing in the record, and the report specifically, to support Mother's assertion that the FCS mediator uniquely applied family law principles in drafting her report or recommendations. The mediator gathered information from a broad source of information, including primarily the parents, and none was impermissible for the juvenile court to consider under dependency law. (See, e.g., § 304 ["In deciding issues between the parents . . . regarding custody of a child who has been adjudicated a dependent of the juvenile court, the juvenile court may review *any records* that would be available to the domestic relations division of a superior court hearing that matter," which would include the family court files pertaining to matters of paternity, support, issuance of a domestic violence temporary restraining order, and custody as summarized in the FCS report. (Italics added.)].)

Nevertheless, the juvenile court did not merely or arbitrarily adopt the FCS recommendations, as Mother argues, without consideration of its obligations to determine the children's best interests under dependency law. The court acknowledged, when it initially ordered the parties to attend FCS mediation, that an FCS report will simply allow the court to "get a baseline on how the [parents] feel about sharing custody, what type of visitation can be worked out, what can be worked out if [Father] gets deployed." When it issued the exit orders, the court expressly stated it had not only reviewed the FCS mediator's report, but that it was also relying on the entire dependency

case file and the court's personal notes and familiarity with the background information on the case.[5]

The court also acknowledged its familiarity with family law proceedings and FCS mediation, stating that it had read hundreds of FCS mediation reports and understood how their information was compiled and presented. The court then recognized its limited authority as a juvenile court judge and its obligation to apply juvenile dependency law principles and, in particular, to focus on the best interest of the children. Although we are required to presume a trial court was aware of and followed the applicable law (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 398), here, the record unambiguously demonstrates the juvenile court knew and applied the appropriate dependency law principles in determining custody orders for the children. The court made explicit its considerations were "limited to the best interest of the children." (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268 (*Nicholas H.*) ["When making a custody determination in any dependency case, the court's focus and primary consideration must always be the best interests of the child."].)

We further disagree with Mother's contention that the juvenile court " 'effectively punt[ed] and delegate[d] to family court the issues concerning [the children's] *custody*' " (italics added), when it commented that certain "issues that remain fall squarely within the jurisdiction and the culture of family court." Mother has taken the court's comments out of context. The court fulfilled its obligations in issuing custody orders, and then declined to

___

[5]     Since the juvenile court stated it was relying on its knowledge of the *entire* dependency case file, Mother's complaint that the FCS report "*does not* mention pertinent juvenile-court findings and orders . . . [and] excludes pertinent information about the children's dependency" is of no consequence.

hear "Mother's concerns about communication, or lack thereof, Mother's concerns about the specifics related to education, and/or her access on a daily basis or any other form of access"— which, as the juvenile court aptly noted, do "fall[ ] squarely within the jurisdiction and culture of family court and the nature of the co-parenting issues." And since the exit orders become part of the relevant family law file (§ 362.4, subds. (a) & (b)), either parent is free to seek further orders in family court regarding issues such as communication and access to educational information.

## II.

### *No Abuse of Discretion in the Juvenile Court's Custody Orders*

We now proceed to the merits of Mother's claim that the juvenile court abused its discretion in awarding Father with primary physical custody of the children, instead of equal physical custody to the parents. Section 362.4 authorizes the juvenile court to issue a custody and visitation order, or an exit order, when it terminates dependency jurisdiction over a child. (§ 362.4, subd. (a); see *In re T.S.* (2020) 52 Cal.App.5th 503, 512–513.) "When making a custody determination in any dependency case, the court's focus and primary consideration must always be the best interests of the child." (*Nicholas H.*, *supra,* 112 Cal.App.4th at p. 268.) "The juvenile court has a special responsibility to the child as *parens patriae* and must look to the totality of the child's circumstances when making decisions regarding the child." (*Chantal S.*, *supra,* 13 Cal.4th at p. 201.) It has "broad discretion to decide what means will best serve the child's interest" and "[i]ts determination will not be reversed absent a clear abuse of that discretion." (*In re Corey A.* (1991) 227 Cal.App.3d 339, 346.)

"We normally review the juvenile court's decision to terminate dependency jurisdiction and to issue a custody (or 'exit') order pursuant to section 362.4 for abuse of discretion [citation] and may not disturb the order

18

unless the court ' " 'exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations].' " ' " (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300; accord *In re M.R.* (2017) 7 Cal.App.5th 886, 902.) "The trial court's judgment is presumed correct. [Citation.] All conflicts are resolved in favor of the judgment and all legitimate inferences are indulged in to uphold the juvenile court's determinations." (*In re K.S.* (2016) 244 Cal.App.4th 327, 337.) We will find an abuse of discretion by a trial court only when we conclude that under all the circumstances, viewed most favorably in support of the decision, no judge reasonably could have made that decision. (*Estate of Sapp* (2019) 36 Cal.App.5th 86, 104.)

As Mother emphasized in her opening brief on appeal, "[a]lthough both the family court and the juvenile court focus on the best interests of the child[,] significant differences exist." (*Jennifer R.*, *supra*, 14 Cal.App.4th at p. 712.) Because "[t]he issue of the parents' ability to protect and care for the child is the *central issue*" in a dependency case, "[t]he presumption of parental fitness that underlies custody law in the family court just does not apply to dependency cases." (*Ibid.*, italics added.) "Rather, the juvenile court, which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child *without any preferences or presumptions*." (*Ibid.*, italics added.)

"Thus, for example, a finding that neither parent poses any danger to the child does not mean that both are equally entitled to half custody, since joint physical custody may not be in the child's bests interests for a variety of reasons. . . . By the same token, a finding that the parent from whom custody was removed no longer poses a risk of detriment or that the parent whose custody has been subject to supervision no longer requires supervision is

19

relevant to, but not necessarily determinative of, the best interests of the child." (*Nicholas H.*, *supra*, 112 Cal.App.4th at p. 268; accord *John W.*, *supra*, 41 Cal.App.4th at p. 965 ["In making 'exit' orders, . . . it is the best interests of the child, in the context of the peculiar facts of the case before the [juvenile] court, which are paramount. The court is not required to apply a [family law] per se rule that the child's time must be split in half as long as neither parent poses an active threat."].)

On the record before us, we see nothing arbitrary, capricious, or patently absurd in the juvenile court's determination that Father should provide the children's primary residence, Mother should parent them on alternating weekends Friday to Monday and every Wednesday overnights, and both parents should alternate the holidays equally.

At the time of the November 2020 interim review hearing, the Agency reported that both parents had "shown behavior changes consistent with mitigating the dangers and safety issues" to the children and both could co-parent safely using email communication and third-party custody exchanges. The Agency was recommending the court award joint legal custody with physical custody to Mother. However, it was Mother's conduct in disciplining N.W. on December 9, 2020 and her subsequent handling of the incident that caused the Agency to later change that recommendation.

Although the Agency ultimately closed its investigation as "[i]nconclusive" as to whether Mother had committed physical abuse of N.W., the Agency reported that it remained "extremely concerned" for the children in Mother's care. Mother had provided different scenarios for the incident, failed to take responsibility, and, instead, blamed N.W. and called her a liar. N.W. reported that it made her " 'sad' " when Mother " 'smacked' " her and caused her teeth to fall out. The Agency found Mother's response to N.W.

20

could be "very detrimental to the mental health of her children." Additionally, the Agency noted that Mother's service providers had implemented a safety plan for her own mental health. In contrast, the Agency reported it had "no concerns for the children's safety or care" since they were placed in Father's care in late December 2020. For these reasons, in January 2021, the Agency recommended to the court that it award physical custody to Father. Even when the Agency withdrew its section 388 petitions to change placement from Mother to Father and was recommending the court award joint physical custody to both parents, in March 2021, it still reported concerns regarding Mother's "impulsive reactions" to the children. Moreover, the Agency reported Father had "shown his ability to step up as a full time parent for the children in addition to providing a safe home for the children" and the children appeared to be doing very well with him.

Contrary to Mother's suggestion, there was no circumstance, presumption, or preference that entitled her to equal physical custody of the children. The juvenile court had wide discretion to determine the children's best interests, considering "the parents' ability to protect and care for the child[ren] [as] the *central issue*." (*Jennifer R.*, *supra*, 14 Cal.App.4th at p. 712, italics added.) And there is ample support that its custody orders were within the bounds of reason. Since the children had been living with Father for the preceding six months and were doing "very well" in his care, the court's order that Father provide the primary residence reasonably promoted stability and continuity for the children. It also promoted the children's mental and emotional health, in light of concerns that Mother's response to N.W. after the December 2020 incident of excessive discipline could be "very detrimental to the mental health of her children."

Other than a claim that the juvenile court "arbitrarily adopted the family court mediator's proposal," which we have rejected as unsupported by the record, Mother fails to demonstrate how exactly the court abused its discretion. She contends the children were "formally placed" with her at the time of the exit orders in support of her claim that "there were inadequate facts supporting the *proposed custody change*" which would have the children live primarily with Father and not Mother. (Italics added.) As the Agency correctly noted, that is not accurate. The juvenile court formally detained the children *with Father* on January 25, 2021, due to the safety concerns that had arisen after Mother had " 'popped' " N.W. in the mouth and knocked out the child's teeth. The children were not formally placed solely with Mother leading up to the time the court issued the exit orders on June 14, 2021; they had been in Father's home for the preceding six months.

Mother makes one other contention that "[s]he was more active in [N.W.'s] family counseling than Father and was seeking additional services for [the] family" and "the mere fact the girls lived with [Father] the preceding six-months or so is insufficient evidence that their best interests would be promoted primarily in his care." These arguments, however, overlook the applicable standard of review. Even when two or more inferences can reasonably be deduced from the evidence, the reviewing court has no authority to substitute its decision for that of the trial court when reviewing for an abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 319; *In re Caden C.* (2021) 11 Cal.5th 614, 641.)

In sum, Mother has failed to demonstrate that the juvenile court's exit orders are arbitrary, capricious, or patently absurd, and so we will affirm the orders.

## DISPOSITION

The orders are affirmed.

DO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

DATO, J.